# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-2207V

| | |
|---|---|
| FRAN BASKIN, | Chief Special Master Corcoran |
| Petitioner, | Filed: June 2, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Renee J. Gentry*, The Law Office of Renee J. Gentry, Washington, DC, for Petitioner.

*Lauren Kells*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On November 23, 2021, Fran Baskin filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on October 1, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties were unable to resolve the claim on their own, and have now fully briefed entitlement and damages (ECF Nos. 29-33, 38, 41, 43). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $45,000.00, plus $1,784.18 for out-of-pocket medical expenses.

I.   **Factual Evidence**

   **A. Medical Records**

Petitioner received the vaccine involved in this case in her left deltoid on October 1, 2019. Ex. 1 at 14. Two months later (December 2, 2019), she saw her primary care physician ("PCP"), Dr. Shishir Khetan, for a routine physical examination. Ex. 2 at 34. During this appointment, Petitioner complained of "[l]eft upper arm pain since getting a flu shot 2 months ago." *Id.* at 37. Her pain occurred only when moving in certain positions, and she had no pain at rest. *Id.* Dr. Khetan suggested physical therapy ("PT"), but Petitioner deferred. *Id.*

Two weeks later (December 17, 2019), Petitioner underwent a PT evaluation for left shoulder pain. Ex. 3 at 70. The record lists an onset date of October 1, 2019 – the date of vaccination – explaining that "[i]n October 2019 after receiving a flu shot the patient began experiencing left shoulder pain." *Id.* Over time, the pain had worsened and limited her mobility. *Id.* She described her pain as "achy and constant at times," and rated it five out of ten at the time of the evaluation, ranging to six at worst. *Id.* On examination, she was noted to have decreased range of motion ("ROM"), and her left shoulder exhibited positive impingement signs.[3] *Id.* at 71, 72.

Petitioner went to her PCP's office on December 30, 2019, for treatment of osteoporosis. Ex. 2 at 30-33. She reported walking and working out with a trainer twice a week. *Id.* at 32. Petitioner reported two allergic reactions, but did not report any concerns with her shoulder and her ROM was noted to be normal on examination. *Id.* at 32-33.

On January 29, 2020, Petitioner told her physical therapist that she had fallen and landed on her right side recently, and may have fractured a rib, but her left shoulder was unaffected. Ex. 3 at 81. She was advised to see a doctor. *Id.* The next day, she saw her PCP, explaining that she had tripped a few days earlier and broken her fall with her left forearm, with the right side of her chest, right hip, and right side of her face all hitting the sidewalk. Ex. 2 at 28. She had pain in her face and chest wall, but not her hip or arm. *Id.* She did not report any concerns with her left shoulder. *Id.*

---

[3] Petitioner had reduced shoulder ROM in *both* shoulders, with greater deficits on the left in flexion and external rotation, and a greater deficit on the right in abduction. Ex. 3 at 71.

2

A few days later (February 4, 2020), Petitioner returned to PT, now with visible bruises along her left forearm and right outer thigh. Ex. 3 at 83. The therapist noted that Petitioner "demonstrate[d] more pain with [external rotation] at 90 degrees possibly due to soft tissue restrictions of the subscapularis." *Id.*

The following week, on February 11, 2020, Petitioner saw orthopedist Dr. Alison Kitay complaining of left shoulder and left forearm pain. Ex. 4 at 8. She explained that her left shoulder pain began "in October 2019 after she got a flu shot." *Id.* She had "some soreness in her arm right after" vaccination but thought it was normal post-vaccination pain. *Id.* When she continued to have trouble raising her arm overhead several weeks later, however, she realized something was wrong and sought treatment. *Id.* She had done six weeks of PT, with some improvement, but her pain persisted. *Id.* She had difficulty moving her arm in the morning, getting dressed, lying on her side, and reaching overhead. *Id.* She rated her pain as "moderate with a rating of 8/10," describing it as sharp and aching. *Id.*

Petitioner told Dr. Kitay that her left forearm pain had begun on January 28th, when she tripped and fell. Ex. 4 at 8. Initially she thought she only injured her right side, but about a week later she noticed a large bruise on her left forearm, with tenderness in one area. *Id.* On examination of her left shoulder, Petitioner had full forward flexion, abduction, external rotation, and internal rotation, but slightly reduced strength compared to her right shoulder. *Id.* at 9. She had pain with cross body adduction and positive impingement signs. *Id.* Shoulder and forearm x-rays were negative. *Id.* Petitioner was diagnosed with left shoulder impingement syndrome and left forearm contusion. *Id.* Concerning Petitioner's shoulder, Dr. Kitay explained that she had seen this before, where a vaccine "is placed near the subacromial bursa and leads to inflammation in the bursa." *Id.* at 10. While this could be very painful, it did generally improve in time. *Id.* Petitioner had already made "great gains with therapy," and Dr. Kitay offered a cortisone injection, which Petitioner declined. *Id.* Dr. Kitay authorized additional PT, stating that if Petitioner did not continue to improve an MRI could be considered. *Id.*

At PT on February 14, 2020, Petitioner stated that she had been experiencing more left shoulder stiffness and discomfort since her last visit, which had taken place about a week after her late January fall that injured her left forearm. Ex. 3 at 85. After her PT session, her left shoulder mobility had improved. *Id.* At her next session a few days later (February 19, 2020), Petitioner's left shoulder ROM had improved and she described her pain as less intense, although her pain ratings remained unchanged *Id.* at 89-91. She was recertified for another six weeks of PT. *Id.* at 92.

By February 28, 2020, Petitioner reported less pain overall to her physical therapist; at this point, her primary complaints were stiffness and decreased mobility. Ex. 3 at 94. On March 10, 2020, Petitioner's physical therapist noted that her shoulder remained stiff and painful. *Id.* at 98. She did not perform her home exercises regularly

3

"possibly due to the pain." *Id.* Petitioner stopped PT at this point due to the COVID-19 Pandemic. Ex. 5 at ¶ 6.

Nearly two months later (May 6, 2020), Petitioner saw Dr. Kitay via telemedicine. Ex. 4 at 5. Her PT had ended in March due to COVID-19, at which point she had been about 60% better. *Id.* Since then, things had gotten "much worse," and her current pain level "may be worse than it was when it first started," ranging from one to eight out of ten depending on her activities. *Id.* She was unable to do her home exercises due to pain. *Id.* On examination, her ROM was 90 degrees in forward flexion, 70 degrees in abduction, and 15 degrees in external rotation. *Id.* at 6. Dr. Kitay was concerned that Petitioner's pain and limitations had continued for over six months, and recommended further treatment. *Id.* Petitioner went to Dr. Kitay's office the next day and received a cortisone injection. *Id.* at 3-4.

Almost two months later (July 1, 2020), Petitioner went to her PCP's office. Ex. 2 at 22-25. She was walking two to three miles daily, and did not raise any concerns about her shoulder. *Id.* On October 16, 2020, Petitioner received a flu vaccine in her left shoulder at her PCP's office. *Id.* at 20-21. On December 7, 2020, Petitioner saw her PCP for an annual exam. *Id.* at 15. The record does not mention any concerns with her left shoulder.

Nonetheless, Petitioner was seen a week later (December 14, 2020) for another PT evaluation. Ex. 3 at 105. Petitioner reported improved shoulder mobility since the summer. *Id.* She had been doing her home exercises and felt stronger, and could now reach behind her back but still struggled to reach her bra. *Id.* She now reported secondary neck pain resulting from overcompensating for her shoulder injury. *Id.* She rated her pain as five out of ten. *Id.* On examination, Petitioner's left shoulder active and passive ROM were limited. *Id.* at 105-06. Her symptoms were noted to be consistent with a left frozen shoulder. *Id.* at 106. Petitioner attended one more PT session on December 29, 2020. Petitioner continued to receive prolia injections at her PCP's office in 2021, without mentioning left shoulder pain. Ex. 2 at 7-14.

Petitioner attended a total of 11 PT sessions between December 17, 2019 and March 10, 2020, as well as two in December 2020. Ex. 3 at 70-108.

### B. Testimonial Evidence

Petitioner submitted a declaration[4] in support of her claim, as well as a witness statement from Joanne Chang. Exs. 5, 6. Petitioner states that after vaccination, she "felt immediate pain at the injection site, but I dismissed it as normal flu shot pain." Ex. 5 at ¶ 3. However, it did not go away as she expected. *Id.* Her PCP recommended PT. *Id.* at ¶ 4.

---

[4] Although Petitioner labeled this document as an affidavit, it is not notarized. Nonetheless, it is acceptable as a declaration pursuant to 28 U.S.C. § 1746.

4

When Petitioner's shoulder pain persisted after five PT sessions, she consulted with an orthopedist, who recommended additional PT. Ex. 5 at ¶ 5. Petitioner continued PT until she no longer could, due to restrictions related to COVID-19. *Id.* at ¶ 6. She tried to do PT exercises at home, without much success. *Id.*

Petitioner returned to Dr. Kitay in May 2020 because her pain had gotten worse and she felt like she could barely move her arm. Ex. 5 at ¶ 7. The cortisone injection Dr. Kitay administered helped, but did not completely relieve her pain. *Id.* at ¶ 8.

Petitioner explains that during the first six months, prior to her cortisone injection, it was painful to lift her arm to put a shirt on. Ex. 5 at ¶ 10. During the worst period, March and April 2020, she could not even do that, and only wore button down shirts. *Id.* She had trouble reaching things on high shelves and washing her hair. *Id.* at ¶ 11. Although she continued to work out with a trainer due to her osteoporosis, and took up Tai Chi, she had to adjust both of those due to her arm pain and stiffness. *Id.* at ¶ 12.

Petitioner volunteers for the National Park Service at the Vietnam Veterans Memorial, and states that her arm injury limited her activities there. Ex. 5 at ¶ 13. One of her duties is helping visitors get rubbings of names on the wall. *Id.* However, this often requires carrying a ladder to reach names that are high on the wall, and her arm pain impaired her ability to do so. *Id.* Petitioner finds this activity meaningful, and had to give it up until her cortisone injection.[5] *Id.*

As of November 2021 (when she signed her declaration), Petitioner continued to have trouble sleeping at night. Ex. 5 at ¶ 9. She had to modify how she sleeps, using a pillow to prop up her arm. *Id.* at ¶ 14. She was able to do most activities at that point, although her shoulder remained achy and sore. *Id.*

Joanne Chang, the director of the Wu Wei Tai Chi Club, submitted a witness statement dated June 25, 2021 on Petitioner's behalf. Ex. 6. The statement is not notarized or sworn under penalty of perjury pursuant to 28 U.S.C. § 1746, limiting its evidentiary value.

Ms. Chang states that Petitioner joined her facility's Tai Chi classes in December 2017. Ex. 6. She explains that during a class "in 2019" – without addressing the critical question of *when* in 2019 – Ms. Chang noticed that Petitioner was struggling to lift her arm and was not able to move as she could previously. *Id.* Petitioner could no longer raise her left arm upward or forward. *Id.* Ms. Chang was concerned and asked Petitioner about it. *Id.* Petitioner explained that her left arm had been sore since a flu vaccination. *Id.* The nurse had "not done a careful job" administering the vaccine, resulting in pain ever since vaccination. *Id.*

---

[5] It is unclear from Petitioner's declaration whether she gave up volunteering entirely, or merely was limited in what she could do.

5

## II.    Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[6] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate

---

[6] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

7

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B. Parties' Arguments on Entitlement

Petitioner asserts that her left shoulder pain began immediately after vaccination. Petitioner's Motion, filed Feb. 17, 2024, at *13 (ECF No. 38) ("Mot."). Although Petitioner did not seek care for her shoulder until two months later, thereafter she consistently reported immediate pain following vaccination that did not go away – and no records suggest a contrary onset. Mot. at *13-15.

Respondent argues that the only record evidence supporting an onset of pain within 48 hours of vaccination "comes from petitioner's words alone and/or was produced for purposes of this litigation, and is unsubstantiated by the contemporaneous medical records." Respondent's Response, filed Apr. 17, 2024, at *9 (ECF No. 41) ("Resp."). Respondent emphasizes that Petitioner's first report of shoulder pain was "an incidental complaint made two months after her flu vaccination, during a routine annual physical," and no diagnosis of any shoulder pathology was made at that time. Resp. at *10. Petitioner reported pain "since getting a flu shot 2 months ago," without further elaborating. *Id*. Two weeks later, she imprecisely told her physical therapist that her pain began "in October after receiving a flu shot." *Id*. Respondent argues that Petitioner's statement to her orthopedist four months after vaccination that her pain started "right

8

after" vaccination is less contemporaneous and thus should be given less weight than her earlier, more vague, statements. *Id.*

Respondent also objects to Ms. Chang's statement that she observed Petitioner having difficulty lifting her arm during a class in 2019 as vague and nonspecific. Resp. at *11. Respondent cites *Reusser v. Sec'y of Health and Human Servs.*, 28 Fed. Cl. 516, 523 (1993) for the proposition that oral testimony *in conflict* with contemporaneous documents is entitled to little evidentiary weight – without acknowledging that here, the testimonial evidence is not *in conflict with* contemporaneous medical records. *Id.* Respondent adds that Petitioner's medical history reflects that she promptly sought treatment for other acute injuries, further casting doubt on her assertion that her shoulder pain began within 48 hours of vaccination. Resp. at *11-12. As evidence, Respondent points to Petitioner's January 2020 fall, after which she saw her PCP within a few days, followed by an orthopedist two weeks later. *Id.*

Petitioner replies that both the Vaccine Act and previous decisions make clear that it is not necessary for a petitioner to *seek care* within 48 hours of vaccination to establish that the onset of his or her pain occurred within that time. Petitioner's Reply, filed May 15, 2024, at *1-2 (ECF No. 43) ("Reply"). And I have previously stated that "[t]he lack of a single contemporaneous item of evidence specifically identifying onset in 48 hours is simply not a basis for finding against Petitioner, since the other evidence taken together supports a favorable finding." *Id.* at *2 (quoting *Kleinschmidt v. Sec'y of Health & Human Servs.*, No. 20-0680V, 2023 WL 9119039 (Fed. Cl. Spec. Mstr. Dec. 5, 2023)).

Petitioner asserts that Respondent's argument that Petitioner sought immediate help for her January 2020 fall "fails to take into account the nature of [that injury] compared to SIRVA injuries," in that a fall is a traumatic injury while injection site pain is routine. Reply at *2. And while evidence of a medical visit for shoulder pain within two days of vaccination would be quite relevant, it is more common for SIRVA petitioners to delay seeking formal medical care for weeks or even months. *Id.* at *2-3 (citing *Winkle v. Sec'y of Health & Human Servs.*, No. 20-0485V, 2021 WL 2808993 (Fed. Cl. Spec. Mstr. June 3, 2021) and *Amor v. Sec'y of Health & Human Servs.*, No. 20-0978V, 2024 WL 1071877 (Fed. Cl. Spec. Mstr. Feb. 8, 2024)).

### C. Factual Finding on Onset of Shoulder Pain

A review of the evidence leads to the conclusion that, more likely than not, Petitioner's shoulder pain began within 48 hours of vaccination. When Petitioner first sought care two months after vaccination, she reported left upper arm pain *since* her vaccination. Ex. 2 at 37. This report, provided for purposes of receiving medical treatment, strongly suggests that Petitioner's pain began quite close in time after vaccination. That she reported it during an annual physical, rather than making an appointment specifically for her shoulder, may be of slight relevance to damages (suggesting a less intense injury), but is of little significance on the question of onset. And Respondent's argument that a

report of pain since vaccination, at a consultation two months after vaccination, is too vague to support Table onset is not compelling. While this record does not precisely state the date and hour of the onset of Petitioner's pain, in the context of the record of this case I find it still supports a finding that Petitioner's pain began within 48 hours of vaccination.

I also note that Petitioner's PT record lists an onset date of October 1, 2019 – the date of vaccination – and she related her pain to vaccination. Ex. 3 at 70. And she told her orthopedist that she had arm pain right after vaccination that persisted. Ex. 4 at 8. Finally, Petitioner's testimonial evidence is not in conflict with the contemporaneous medical records. Petitioner told her treating providers that her pain began on the date of vaccination and that she had pain since vaccination; and her declaration states that she felt immediate pain that did not go away. These accounts are consistent; Petitioner's declaration corroborates the medical records and provides additional details about Petitioner's experience of her injury and thought process in deciding when to seek care.

Furthermore, treatment delay by itself does not undermine a favorable onset finding. A treatment delay of two months is not uncommon in a SIRVA case. *See Diaz v. Sec'y of Health & Human Servs.*, No. 20-1003V, 2023 WL 8440873, at *8 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset occurred on day of vaccination, even though the petitioner did not seek treatment until over three months later); *Graczyk v. Sec'y of Health & Human Servs.*, No. 21-0376V, 2023 WL 4573868 (Fed. Cl. Spec. Mstr. June 16, 2023) (finding onset within 48 hours where Petitioner first sought care two months after vaccination). And there is *no* evidence in the record suggesting that Petitioner's pain began later than 48 hours after vaccination. At most, a two month delay may be relevant to damages, but it does not disqualify a claim if the record otherwise preponderantly supports a finding that the petitioner's pain began within 48 hours of vaccination. *See Holveck v. Sec'y of Health & Human Servs.*, No. 22-0095V, 2024 WL 5349130, at *7 (Fed. Cl. Spec. Mstr. Dec. 5, 2024) (a three-month delay in seeking care does not mean the onset of pain was not within 48 hours if the record otherwise supports such a finding, but may be relevant to damages).

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

Petitioner's ability to meet the remaining QAI requirements is not disputed,[7] and I find that they are preponderantly satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Ex. 3. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. Exs. 2, 3, 4.

---

[7] Respondent does not raise any arguments concerning the remaining SIRVA Table QAI or statutory requirements. Resp. at *7-14.

10

The statutory requirements applicable to all claims are also preponderantly established. Petitioner received a covered vaccine in the United States. Ex. 1 at 14. She experienced residual effects of her injury for more than six months. Ex. 3 at 98; Ex. 4 at 5. And she states no civil action has been filed on her behalf for her vaccine-related injuries, nor has anyone collected any awards or settlements of a civil action for her vaccine-related injuries. Ex. 5 at ¶ 16. Thus, Petitioner is entitled to compensation.

### III. Damages

#### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section I-II of *Timberlake v. Sec'y of Health & Human Servs.*, No. 20-1905V, 2025 WL 721730 (Fed. Cl. Spec. Mstr. Feb. 19, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00," in addition to certain unreimbursable expenses resulting from the vaccine-related injury. Section 15(a)(1), (a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[8]

#### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $75,000.00, citing *Black*, *Dawson-Savard*, *Miller*, and *Cyr*.[9] Mot. at *16. Petitioner asserts that her injury was of moderate severity and continued for over two years, with continued ROM issues and pain. *Id.* at

---

[8] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[9] *Black v. Sec'y of Health & Human Servs.*, No. 20-0777V, 2022 WL 3335594 (Fed. Cl. Spec. Mstr. July 12, 2022) (awarding $75,000.00 in pain and suffering); *Dawson-Savard v. Sec'y of Health & Human Servs.*, No. 17-1238V, 2020 WL 4719291 (Fed. Cl. Spec. Mstr. July 14, 2020) (awarding $130,000.00 for past pain and suffering and $500 per year for future pain and suffering); *Miller v. Sec'y of Health & Human Servs.*, No. 20-604V, 2022 WL 3641716 (Fed. Cl. Spec. Mstr. July 22, 2022) ($75,000.00 pain and suffering award); and *Cyr v. Sec'y of Health & Human Servs.*, No. 21-0012V, 2024 WL 991944 (Fed. Cl. Spec. Mstr. Feb. 6, 2024) ($75,000.00 pain and suffering award).

11

*19-20. She treated with one cortisone injection and 14 PT sessions, and was scheduled for more PT before it was cancelled due to COVID-19. *Id.* Although she continued her home exercises during the early months of the Pandemic, her condition became "markedly worse." *Id.*

Respondent proposes a pain and suffering award of no more than $38,500.00, citing *Valdez*, *McGraw*, and *Ramos*.[10] Resp. at *14. Respondent emphasizes that Petitioner waited two months before seeking care, at which time she reported her injury during a regularly scheduled annual wellness exam. *Id.* at *19. Furthermore, at that time she stated that she experienced pain only "when moving in certain positions" and had no pain at rest. *Id.* Petitioner exercised with a trainer on a regular basis and participated in Tai Chi, and Respondent states that she "did not mention any limitations in her daily activities or exercise" – ignoring Petitioner's statement in her declaration (Ex. 5 at ¶ 12) that she had to adjust her Tai Chi and trainer workouts due to her arm pain and stiffness.[11] *Id.* at *19-20.

Respondent notes that Petitioner rated her pain at five or six in December 2019 and declined a steroid injection in February 2020, concluding that "[b]y all accounts, petitioner's left shoulder pain was very mild." Resp. at *20. It was only after her January 2020 fall that Petitioner rated her shoulder pain as moderate and eight out of ten. *Id.* Respondent urges that any damages award "consider that petitioner's presentation and treatment after January 2020 was not due to her vaccine injury alone." *Id.*

Respondent argues that Petitioner "overstates the extent and length of her treatment" in asserting that her injury continued for over two years. Resp. at *21. Respondent notes that Petitioner treated for four months, followed by a two-month gap, resulting in a total treatment course of seven months. *Id.* Respondent describes Petitioner's treatment course as "extremely conservative, consisting of only ten PT sessions and one steroid injection." *Id.* By February 2020, Petitioner reported that her shoulder symptoms had "certainly improved" and she declined a steroid injection. *Id.* (citing Ex. 4 at 8). Respondent suggests that Petitioner's return to PT in December 2020 following a seven month treatment gap should not be factored into an award, noting that during this gap Petitioner had intervening medical appointments without mentioning left

---

[10] *Valdez v. Sec'y of Health & Human Servs.*, No. 21-0394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (awarding $35,000.00 in pain and suffering); *McGraw v. Sec'y of Health & Human Servs.*, No. 21-72V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024) (awarding $37,500.00 in pain and suffering); *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (awarding $40,000.00 in pain and suffering).

[11] To the extent that Respondent meant that Petitioner did not mention exercise limitations *specifically to her PCP*, this is not required and is of minimal significance.

shoulder pain, and even received her 2020 flu vaccine in her left, injured, shoulder during this time. *Id.*

Respondent asserts that it is "inconceivable how *Dawson-Savard* is comparable" to this case, noting that the petitioner in that case had 13 steroid/trigger point injections – *12 more* than Ms. Baskin. Resp. at *22. Respondent acknowledges that the *Miller* petitioner had a similar treatment delay, but asserts that the petitioner in that case had a more difficult treatment course, with three steroid/trigger point injections, an MRI, and two rounds of PT totaling about 25 sessions. *Id.* at *23. And the *Cyr* petitioner sought treatment just two days after vaccination, with a more arduous treatment course including 45 PT sessions over nine months, chiropractic treatment, and prescription medications. *Id.* Respondent concludes that Petitioner's SIRVA was "very mild to mild," warranting a relatively low award. *Id.* at *24.

Petitioner replies that she reported a pain level of five to six at her first PT session, and attended PT until her treatment paused due to the Pandemic.[12] Reply at *4. When she stopped therapy in March 2020, she was only about 60% improved. *Id.* Thereafter, her shoulder pain became *worse*, ranging between one to eight out of ten by May 2020. *Id.* At that point, she received a cortisone injection. *Id.* After her cortisone injection, her pain receded to a manageable level, but "has never gone away." *Id.* at *5.

Petitioner asserts that she continues to have pain "[f]ive years out . . . to this day," citing her November 2021 declaration (Ex. 5) in support of this contention. Reply at *5. She asserts that she received conservative treatment not because her SIRVA was mild, but because she did not want surgery. *Id.* Petitioner cites my statement in *Amor*, 2024 WL 1071877, at *8, that in cases involving mild to moderate levels of pain, the lack of significant pain "is often evidenced by a delay in seeking treatment – over six months in one case." *Id.* at *5-6. Petitioner appears to infer from this that seeking care after two months is indicative of greater pain – which can be the case, but is not necessarily so.

### C. Appropriate Compensation for Pain and Suffering

I find that the record preponderantly supports a finding that Petitioner's injury was relatively mild and persisted for almost 15 months, until late December 2020. However, she experienced a *lengthy* period of relief from her May 2020 cortisone injection, not reporting any problems with her shoulder again until seven months later. In the interim, she received her seasonal flu vaccine in her left (meaning at-issue) shoulder, and received other care from her PCP, notably including an annual physical, without mentioning shoulder pain. Following a brief return to treatment for two PT sessions in December 2020, although Petitioner's testimonial evidence suggests that she may have

---

[12] Petitioner asserts that she attended 14 PT sessions before pausing in March 2020. Reply at *4. However, the record reflects that Petitioner attended 11 PT sessions between December 2019 and March 2020. Ex. 3 at 70-98.

continued to experience minor residual effects, they were not serious enough to warrant medical intervention.

Petitioner's argument that her injury continued for five years finds no record support. The evidence Petitioner cites to establish such an injury course is her declaration from 2021– which could support an injury continuing for *two* years at most. And the *only* evidence of continuing symptoms at the two-year mark is Petitioner's declaration. While I find testimonial evidence useful in corroborating medical records, such evidence is less persuasive when it stands alone. Additionally, Petitioner's November 2021 declaration provides only vague statements, for instance asserting that she had trouble sleeping and had to modify how she slept. This is not sufficient to support a finding that, more likely than not, Petitioner's injury continued to that point, in the absence of corroborating medical record evidence.

Of the cases the parties cite, the closest comparables are *Black* and *Ramos*. Like those petitioners, Ms. Baskin had an injury on the milder side that she treated with conservative care. Ms. Baskin's injury was of a similar duration, although she experienced a lengthy period of relief during that time. She sought care two months after vaccination – sooner than the *Ramos* petitioner (four months), but later than the petitioner in *Black* (15 days). The petitioner in *Black* also reported higher pain levels, up to nine out of ten, and attended acupuncture sessions. Additionally, the petitioner in *Black* was a nurse whose injury impaired her ability to do her job, resulting in her being placed on light duty for seven months and eventually being asked to look for another job – signifying an injury that had not only a greater physical impact, but also a greater impact on the life circumstances, including employment, of the petitioner.

Although Ms. Baskin sought care sooner than the *Ramos* petitioner – which could suggest a somewhat more impactful injury – when she did seek care, she had *no* pain at rest and reported pain only with certain movements, which she rated six out of ten at worst. In contrast, although the *Ramos* petitioner initially rated his pain three out of ten, less than two weeks thereafter he rated his pain as five out of ten at rest, and *ten out of ten* with activity.[13] Petitioner received a cortisone injection, while the *Ramos* petitioner did not.

Taking the record as a whole and the proposed comparable cases into consideration, I find that $45,000.00 represents a fair pain and suffering award in this case.

---

[13] While Ms. Baskin reported a pain level of eight out of ten at one point, this was only after she had fallen and broken her fall with her left forearm – suggesting that the exacerbation of her shoulder pain thereafter may have resulted, at least in part, from something other than her vaccine-related injury.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $45,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[14] Additionally, I find that Petitioner is entitled to **$1,784.18 in out of pocket expenses.**[15]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $46,784.18, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[16]

**IT IS SO ORDERED.**

                                        **s/Brian H. Corcoran**
                                        Brian H. Corcoran
                                        Chief Special Master

---

[14] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[15] The parties agree that this amount is reimbursable. Mot. at*16; Resp. at *24 n.7.

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.